W. G. KENNEDY *v.* M. F. MASON, Administrator.

Where the punishment inflicted by an overseer on the slave of his employers is excessive and cruel, by reason of which, the slave dies, the overseer will be liable to his employer in damages.

APPEAL from the District Court of Ouachita, *R. W. Richardson,* J. Garrett & Ludeling, for plaintiff. McGuire & Ray, for defendant and appellant.

VOORHIES, J. The plaintiff claims $600, with interest, alleged to be a balance due him on a settlement made with the defendant's agent on the 12th of March, 1852, for his salary as overseer of the plantation of the late *James W. Mason.*

KENNEDY
*v*
MASON.

The defendant claims in compensation and reconvention, $1000, averring that her agent retained in the settlement $600, in payment of a negro man named *Jim Crack*, one of the slaves attached to the plantation, who died in Jan., 1852, in consequence of having been cruelly whipped and beaten by the plaintiff.

The alleged reservation is in these words:

"On this 12th of March, 1852, *John C. C. Sharp*, agent for the estate of *J. W. Mason*, has paid to *Warren G. Kennedy*, as stated above, the sum of $866 15, which by agreement is applied first to extinguish the balance due on the obligation of said *John C. C. Sharp* for estate, dated January 1st, 1851, which is surrendered to *John C. C. Sharp*, agent, and the balance of the said amount paid is to be imputed as far as it goes to the payment of the wages for the year 1851, said *Sharp* refuses to pay the balance, $600, until it shall be ascertained judicially, whether the death of the slave *Jim Crack* was caused by any improper treatment of said *Kennedy*. March 12th, 1852. Signed in duplicate.

W. G. KENNEDY,
JOHN C. C. SHARP."

The question then to be considered, in order to fix the liability of the plaintiff, is, whether the death of the slave *Jim Crack* was caused by any improper treatment or imprudence on the part of the plaintiff.

The testimony of *Ferand* and *Fife* is assailed by the plaintiff's counsel, as unworthy of credit. If discarded, it is contended by them, it would leave the defendant's demand entirely unsupported by proof. On the other hand it is also asserted that some of the plaintiff's witnesses are unworthy of belief, as their testimony is contradictory. Leaving the testimony of the first out of view, although it appears to us corroborated by some of the plaintiff's own witnesses in relation to the material facts. We think it may be safely assumed that the record exhibits the following state of facts: The slave *Jim Crack* had runaway and been absent for some time from the plantation, when he was captured and brought back on the 5th of January, 1852, about seven o'clock in the evening, the weather being extremely cold. He was shortly afterwards stripped of his clothes, tied down with his belly to the cold ground, and beaten with a hand-saw and whip; he remained in that position at least an hour and a half, during which the beating continued with short intermissions. He was then rubbed with a mixture called No. 6, and a dose of castor oil was administered to him. Mr. *Butler*, whose testimony stands unimpeached, says: "I saw the boy standing up with a negro on each side, holding him up; when they turned him loose, he staggered, and fell. The negro called one of the others, by name *John*, and asked him to help him up; the boy helped him up, and took him out of the gate." It appears he was then conducted to his cabin, and about four hours after, found dead in his bed. Dr. *Roane*, who made a *post mortem* examination of his body the next day, about sixteen or eighteen hours after his death, says; "I saw that he had been whipped and considerably bruised on his buttock, and each side of his shoulders. The buttock and sides of the shoulders did not appear much cut, but considerably bruised, from which the blood oozed and stuck to the shirt in a few places. That amount of whipping under ordinary circumstances, would not produce death. I thought it imprudent to whip the boy at that time and under the circumstances. From internal and external indications, I think it more likely that death was caused by a congestive chill,' than by the whipping; but more likely death in this case was caused by a combination of all the circumstances." Under this state of facts we do not think it is unreasonable to infer that the slave's

KENNEDY
*v.*
MASON.

death was caused by the severity of the punishment inflicted upon him, combined with his exposure to the weather. Had the plaintiff taken proper care of him after he retired to his cabin, he might have averted the unfortunate consequence: but he did not. This was gross negligence on his part.

Our code provides, Article 2295, "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." Conceding to the plaintiff the fair reputation which he seems to enjoy as a good and humane overseer, and the approbation of the defendant during the long period he was employed by her as such, yet, we think in this instance, he permitted his passions to mislead him into the commission of an act highly improper and imprudent. The punishment inflicted by him, notwithstanding the opinion of some of the witnesses to the contrary, was excessive and cruel; and, as Dr. *Roane* says, imprudent "at that time and under the circumstances." The Civil Code, Art. 173, Provides: "The master may correct and chastise him, though not with unusual rigor, nor so as to maim or mutilate him, or to expose him to the danger of loss of life, or to cause his death." In *Hendricks* v. *Phillips*, 3 An, 618, Mr. Justice Slidell, as the organ of the court said: "It may be conceded that the planter who employs an overseer, in the absence of orders to the contrary, delegates to him the power of punishment contemplated by law, and necessary for the preservation of discipline and the public order. But, certainly, the overseer is restricted by the same measure of power which the law has imposed upon the owner; and, if he transgresses it, he violates his duty, and is answerable to his employer in damages, and to public justice which he has offended."

We therefore conclude that the plaintiff is liable to defendant for the value of the slave in question as provided for in the reservation made between him and the defendant in their settlement.

It is therefore ordered and decreed that the judgment of the District Court be avoided and reversed, and that the defendant's plea of reconvention be allowed, to an amount sufficient to extinguish the plaintiff's claim, and that the said plaintiff pay the costs of both courts.

*Garrett*, for a re-hearing, filed the following argument:

The plaintiff by his counsel asks for a re-hearing. Owing to the great difficulty of presenting fully, to this court, a case turning entirely on questions of fact, he thinks that injustice has been done, in as much as the jury and District Judge with better means to determine a question of fact, decided in his favor. As your Honors have been unable to concur with the jury and District Court, the plaintiff would respectfully urge that the case be sent back to be investigated by another jury.

If this application should be refused, on the main question as to the cause of the death of the slave, we then insist that the decision is erroneous as to the amount of damages sustained by the defendant. It will not be pretended that she is entitled to more than the value of the slave. The plaintiff contends there is no evidence to show that this slave was worth six hundred dollars. The opinion of the court would indicate that the memorandum at the bottom of the account and settlement, amounted to an *admission* on the part of the plaintiff, that this slave was worth that amount. I see that such is the ground taken by defendant's counsel in the brief filed in this case. If an opportunity had been afforded to plaintiff's counsel to examine this brief before the case was submitted to this court, it would not have been difficult to show that no such admission was ever made by the plaintiff.

An inspection of the account shows that the plaintiff had allowed a large amount of the wages due him for previous years, to remain in the hands of his employer. When he was discharged from her service, he of course asked for a settlement and the payment of the amount due him. *Sharp*, as defend-

ant's agent, had the money in his hands. It rested with him to pay plaintiff just so much as he (*Sharp*) might think proper. *Sharp* for defendant, admitted in this account and settlement, the amount due to plaintiff. He paid a part. He refused to pay the balance $600, for the reason stated. He might have refused to pay the whole debt and assigned the same reason. He had the plaintiff in his power so far as the payment of any part of the amount due was in question. The sole object of this paper was to make a settlement, showing the actual amount coming to the plaintiff on his wages, involving transactions extending back several years. When that amount was ascertained, *Sharp* then paid the plaintiff all except $600, which he refused to pay for the reason assigned. *Sharp* no doubt intended to retain in his hands an amount fully sufficient to cover the value of the slave. But can it be said that the plaintiff assented to this as a the price of the slave. The agreement does not express that the price of the slave was fixed by either party at $600.

As I was present when this agreement was made, and know that there was no such understanding between *Sharp* and plaintiff, I must confess that I have been taken by surprise by this argument in defendant's brief. The ground assumed by defendant in the court below, was, that it was unnecessary to prove a price, and the defendant took a bill of exceptions because the court refused so to instruct the jury. The District Court decided that the value must be proved, 7 Rob. 204.

The defendant's counsel asked one of his witnesses the value of this slave, who said "negroes of the size and age of *Jim Crack* were worth at the time, $900 to $1000, but I don't know what a runaway negro of that character would be worth." "It is admitted that the boy *Jim Crack* had *frequently* run away previous to the last time, at which time he had been out for more than two months." And Mrs. *Essick*, who had "known *Jim Crack* since he was a small boy," declares that with his character and habits he was entirely worthless. Justice would certainly require that your Honors should at least so far amend the judgment rendered, as to allow the question of value of this slave to be determined by the District Court on hearing testimony.

Re-hearing refused.